IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2004

## STATE OF TENNESSEE v. BENNIE NELSON THOMAS, JR.

**Appeal from the Circuit Court for Gibson County**
**No. 7219      Clayburn L. Peeples, Judge**

_____

**No. W2004-00498-CCA-R3-CD  - Filed November 1, 2004**

_____

The defendant, Bennie Nelson Thomas, Jr., was convicted of sale of a Schedule II controlled substance, crack cocaine, a Class C felony, and sentenced as a Range I, standard offender to six years in the Department of Correction.  He was also fined $2000.  He raises two issues on appeal: (1) whether the evidence was sufficient to sustain his conviction; and (2) whether the trial court erred in refusing to declare a mistrial after the improper reference at trial to a prior drug sale by an undercover informant.  Based on our review, we affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the defendant's fine of $2000.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Tom W. Crider, District Public Defender; and Periann S. Houghton, Assistant Public Defender (at trial and on appeal), for the appellant, Bennie Nelson Thomas, Jr.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Garry G. Brown, District Attorney General; and Larry Hardister and Elaine G. Todd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant sold a twenty-dollar "rock" of crack cocaine to Deborah Huffman in Humboldt on May 31, 2002.  Unknown to the defendant at the time, Huffman was working as an undercover informant for the West Tennessee Violent Crime and Drug Task Force.  The defendant was indicted

by the Gibson County Grand Jury on July 29, 2002. At his jury trial on February 12, 2003, the defendant was convicted of sale of a Schedule II controlled substance, crack cocaine.

Huffman testified that on May 31, 2002, she was involved in an undercover operation making "street level" buys of crack cocaine in Humboldt. She was driving her vehicle when the defendant drove up in his vehicle, and either "honked his horn or flagged" her down. She parked her vehicle in an attempt to get the defendant to exit his car and approach hers. However, he would not exit his vehicle, so she got out of hers and approached him. Huffman said her car had audio and video equipment inside and when she exited her vehicle, she turned the video camera, located in her purse, to face the defendant and his car through her open door. She testified, "I asked [the defendant] about a purchase of a twenty. He supplied what appeared to be a twenty dollar rock of crack cocaine and I paid for that purchase with money supplied by the Task Force." She and the defendant agreed to meet an hour later at a Burger King in order for her to purchase a larger amount of crack cocaine. Immediately after the transaction, Huffman drove to meet the members of the Task Force, including Officer Danny Lewis, and turned the crack cocaine over to him. The officers conducted a field test on the substance, which tested positive for cocaine. She gave the officers a statement of what transpired and a description of the defendant. The Task Force officers also retrieved the videotape from the camera in her purse and labeled it for identification. In court, Huffman identified the bag, marked with her initials, containing the crack cocaine. She also testified the defendant was driving a maroon Buick Skylark, with a wide area of silver-colored trim along the bottom and "[v]ery distinctive hubcaps." Sometime after the drug transaction, Huffman was entering the Task Force office and saw the same vehicle in the impound garage and identified it to Officer Lewis as the same vehicle the defendant was driving when he sold her crack cocaine. Prior to the drug transaction on May 31, 2002, she had seen the defendant on two occasions earlier in the day and had been about two feet away from the defendant on each occasion. The defendant had a distinctive gold tooth in the front of his mouth and "corn row braids" at the time of the transaction. Regarding the defendant, Huffman stated, "[T]hat is without a doubt the same gentleman that I purchased crack cocaine from in a maroon Buick Skylark on the 31st."

On cross-examination, Huffman reiterated the distinctive color and styling of the Buick Skylark but acknowledged that "[g]old teeth are quite prominent in the individuals selling cocaine." She also testified the defendant never came to the arranged buy at the Burger King later in the day. On redirect, Huffman stated, "I have absolutely no doubts that the gentleman seated there and the gentleman that I spoke with and had this transaction with on the 31st – absolutely no doubt that they are one and the same person."

Humboldt Police Officer Danny Lewis testified he was assigned to the Drug Task Force and had worked in narcotics since 1990. On May 31, 2002, the Task Force was working in a "high crime and drug trafficking area" of Humboldt known as the "Crossing." The vehicle Huffman was driving was "wired for audio and video," and "the audio was a transmitter with a repeater where [they] were actually able to stay more than a couple of blocks away" and could "hear little bit about what's going on also." The video camera allowed the officers to "see what was going on with the transaction – who they were buying from so we could identify them." After her transaction with the defendant,

Huffman met with the officers and turned the drug over to them. Officer Lewis performed a field test which was positive for cocaine. He later took the rock to the Tennessee Bureau of Investigation Crime Lab in Jackson for testing. Again, the rock tested positive for cocaine, with a total weight of .10 gram. The videotape of the transaction was then played for the jury. Officer Lewis also testified as to the distinctiveness of the Buick Skylark driven by the defendant at the time of the transaction and that the defendant had been arrested in that vehicle about a month later. Although the vehicle was not registered to the defendant, the registration address was the same as the defendant's.

On cross-examination, Officer Lewis admitted he never saw the defendant's vehicle on May 31, 2002, but identified the car on the videotape as the same one driven by the defendant at the time of his arrest and confiscated by the Task Force. He was also able to identify the defendant after examining the videotape "quite a few times."

Leonard Miller testified as an alibi witness for the defendant. He testified that he was a friend of the defendant and that he, the defendant, and "Jerry" all drove to Memphis on Friday, May 31, 2002. He remembered the date because it was his daughter's birthday. They left Humboldt around 6:30 a.m. and went to downtown Memphis, "down on Beale Street and stuff like that." They returned to Humboldt around 9:30 p.m. that night. He testified the defendant was not in Humboldt at the time of the drug transaction, stating, "I know he wasn't. I'll put that on everything I love. That's from God."

On cross-examination, Miller admitted he had no record such as a receipt or diary and no other independent person who could verify their presence in Memphis. He further testified that he initially found out about the defendant's arrest the Monday after they returned from Memphis, although the State pointed out the defendant was not actually arrested until a month later. Miller acknowledged that he had prior convictions for assault and battery and "like burglary, refusing to return rental property back to a place and stuff like that." Miller said he was sentenced to thirteen years for those convictions and had been out of prison for five years.

The defendant elected not to testify.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his conviction for sale of a Schedule II controlled substance.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings

of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Here, there was ample evidence to show that the defendant was the person who sold crack cocaine to the undercover informant. The informant, Ms. Huffman, testified that there was no doubt in her mind that the defendant was the person who sold her the cocaine. She recounted the defendant's description and the distinctive characteristics of the vehicle he was driving. Officer Lewis testified that he identified the defendant based on the videotape and the statement given to him by Ms. Huffman. He also testified that the vehicle the defendant was driving when he was arrested was the same vehicle in the videotape and was registered at the defendant's address. The jury was given an opportunity to assess the credibility of the defendant's alibi witness, Leonard Miller, whom they apparently did not believe. Finally, the jury viewed the videotape and made its own judgment concerning the identity of the person selling drugs on the videotape. We conclude that the evidence was sufficient to sustain the defendant's conviction.

## II. Improper Testimony

The defendant also contends that because Ms. Huffman referenced on cross-examination a prior drug transaction with the defendant, which was not the subject of any criminal charges, the trial court should have declared a mistrial. The State contends the defendant has not shown prejudice by the statement and the trial court did not abuse its discretion by declining to declare a mistrial. We will review the manner in which this issue arose.

Before the trial commenced, the trial court conducted a jury-out hearing and dealt with the question of whether to allow Ms. Huffman to testify concerning her prior meetings with the defendant. The trial court determined that Ms. Huffman would be allowed to testify that she had met and talked to the defendant on prior occasions, but not as to the fact that the defendant had sold her drugs on those occasions.

During the trial, on cross-examination of Ms. Huffman, the following exchange took place concerning the earlier meetings with the defendant:

> Q. Okay, and I think you just said that prior to May 31st you don't believe that you had ever seen [the defendant]. Is that correct?
>
> A. No, ma'am. To the best of my knowledge prior to May 31st I had not seen this individual.
>
> Q. And did I understand correctly that the actual sale that we're here today, was that the most protracted conversation you had with [the defendant] that day?
>
> A. Was that the most protracted conversation I'd had with [the defendant] that day?
>
> Q. Yes.
>
> A. No, ma'am. Actually, during the previous sale, I believe we spoke quite a bit longer than the one that we're here for right now.

A bench conference was held during which the following exchange took place:

> [DEFENSE COUNSEL]: I don't think I opened the door to that and I thought that she had been warned not to say that.
>
> THE COURT: Well, she was, and you did ask her a question about the previous conversation.
>
> [DEFENSE COUNSEL]: I just asked if that was the most protracted length of time she had had with him.
>
> THE COURT: I understand what you asked her, but – what do you want me to do?

[DEFENSE COUNSEL]: Well, we believe that that prejudices the jury. They certainly know that there was another sale that day with the same –

THE COURT: I'm not going to declare a mistrial because of that statement. I'll ignore it or I'll tell the jury to disregard it.

[THE STATE]: Well, Your Honor, our position would be that she did open the door. She asked her the question and Ms. Huffman –

THE COURT: The question was – I agree – her question was . . . that the most protracted conversation that she had with him and she said – she then described what was or was about to or whatever.

[THE STATE]: Well, Your Honor, I believe that's a fair response to [defense counsel's] question.

THE COURT: I think that when [defense counsel] asked her anything at all that calls for an – when you said compare the two conversations, you did ask her a question that the only way she can answer is to compare the two conversations.

[DEFENSE COUNSEL]: She didn't have to say what the subject was.

THE COURT: I understand she didn't and she shouldn't have, but she did. Now, I'm going to either advise the jury to disregard that or make no comment, whichever you prefer.

[DEFENSE COUNSEL]: We're stuck. I guess we'll disregard it, won't we?

THE COURT: All right.

Whether to declare a mistrial lies within the sound discretion of the trial court, and we will not disturb the court's decision absent a clear showing of abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold,

563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

We respectfully disagree with the defendant's arguments on appeal that the "paid informant . . . blurted out a statement in an effort to secure conviction" and that the testimony "prejudiced the Defendant such that a mistrial was appropriate and should have been granted." In State v. Paul Hayes, No. W2001-02637-CCA-R3-CD, 2002 WL 31746693 (Tenn. Crim. App. Dec. 6, 2002) perm. to appeal denied (Tenn. May 27, 2003), we explained the factors to be considered in deciding whether a mistrial should be declared following improper testimony by a witness:

> When determining whether a mistrial is necessary after a witness had injected improper testimony, this court has often considered: (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction.

Id. at *4 (citing State v. Demetrius Holmes, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517 (Tenn. Crim. App. Nov. 30, 2001)). In Holmes, we pointed out that these factors were "non-exclusive" and "may not be pertinent in every case." Holmes, 2001 WL 1538517, at *4 n.1. However, in the present case, all three factors are pertinent. First, the improper testimony was on cross-examination, rather than direct questioning from the State. Second, the record shows the State presented relatively strong proof. Finally, the trial court offered to give a curative instruction, which defense counsel waived. Based upon the facts of this case and our review of the record, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court; however, because the judgment form does not reflect the jury-imposed fine of $2000, we remand for entry of a corrected judgment.

_____
ALAN E. GLENN, JUDGE

-7-